The first item is U.S. v. Vance A. Birky. Thank you. Good morning. I'm John Rhodes from the Federal Defenders of Montana. I'm in the Missoula office. I represent Mr. Birky. The district court in calculating the methamphetamine quantity, which resulted in Mr. Birky's guideline calculations, based its calculation of drug quantity on unreliable evidence. We believe there was not sufficient indicia of reliability in the evidence to result in the drug calculations, and therefore we're asking the court to reverse that calculation. The district court relied on two principal basis for reaching its conclusion. First, it relied on a potential co-defendant, Jeffrey Eichert's self-serving triple hearsay, and it's important in considering Mr. Eichert's triple hearsay that the court relied on to remember that Mr. Eichert was not charged by the federal government. I don't know if he was even charged by the state of Montana. So he had all the reason in the world to put the blame on Mr. Birky. In respect to considering Mr. Eichert's testimony, I direct this court to its decision in Corral, where it says it violates due process to consider unreliable double hearsay to calculate guideline sentence. Here the evidence was triple hearsay. Moreover, at page 32 of the excerpts of record, the district court references the fact that according to Mr. Eichert, all Mr. Birky produced was three grams of methamphetamine, yet the district court ultimately concluded that Mr. Birky produced over 1.7 ounces of methamphetamine. Second, and I believe more importantly, the district court relied principally on Officer Meehan's testimony, and for many reasons Officer Meehan's testimony is simply unreliable. It's actually unbelievable if you know anything about producing methamphetamine. We initially note that Mr. Meehan stated that his expertise is in identifying chemicals. He said that at excerpts of record page nine. He didn't say he had any expertise in scientifically estimating drug quantities. In fact, later he disclaimed at one point even relying on any methodologies for calculating the quantities. We just initially note that according to Mr. Meehan, his expertise is in identifying chemicals, period. Despite that stated expertise and the limitations inherent in it, Mr. Meehan went ahead and guessed at quantities, and in doing so he relied on debunked DEA numbers. At page 21 of the excerpts of record, Mr. Meehan speculated that you can get a 93 percent yield from pseudoephedrine. Well, let me just ask you this. Obviously, a lot of this was raised at the sentencing hearing in terms of, and counsel for Mr. Berkey objected, and, you know, why isn't this, you know, the court heard different evidence, different evidence as to different amounts, and the court, you know, why doesn't this just sort of boil down to the court believed some things, didn't believe other things, and why isn't the, you know, and the court was there. We're not there. I mean, we're not going to rehear all of that here, obviously. This is before this court on an abuse of discretion. Right. And the problem is. It's a tough hill to climb for you. Well, it's not because the evidence relied upon by the district court is unreliable. That's the problem. That's the problem with Officer Meehan's testimony. And for instance. Well, I guess what you need to distinguish is, I mean, is it unreliable as a matter of law, or is it just that the court didn't, you know, didn't believe your side of it? I believe it's unreliable as a matter of law. Because if the court just resolves certain factual issues against you, that makes it hard for you, doesn't it? Well, not whereas in this situation where it relied on unreliable, actually unbelievable testimony to rule against us. That's the problem. It's not that the court simply ruled against us. It's that it did so based on unreliable evidence. And I just used an example as Officer Meehan claimed that you can get a 93% yield from pseudoephedrine when converting it to methamphetamine. And he referenced that at page 21 of the excerpts of records. And what that means is when you take pseudoephedrine and you're going to extract it from a pseudoephed pill, he's claiming that you can get 93% of the pseudoephedrine that's in that pseudoephed pill and then go on and convert it to methamphetamine. The 93% yield is a theoretical yield that at best can be achieved in a pristine, sterile laboratory condition by a trained chemist. Here, Mr. Berkey obviously was not a trained chemist. In fact, every time he appeared to attempt to manufacture methamphetamine, or at least several times he started things on fire. Moreover, Mr. Meehan acknowledged that he got the 93% yield from the DEA. If you look at Amendment 611 to the guidelines, that's saying the DEA's estimates are a 50% to 75% yield. So in other words, Mr. Meehan is saying I'm relying on the DEA for the 93% figure, and the DEA is telling the Sentencing Commission that's not an accurate figure. Moreover, Mr. Officer Meehan repeatedly said that he relied on his estimates by eyeballing certain chemicals that were in containers, and he specifically said he kept referencing pictures of those containers. He did that at pages 17, 18, 20, 21, and 28 of the excerpts of records. The Tenth Circuit in Higgins relied on a DEA chemist at 282F3 at 1281 to state the following preposition, quote, there is no scientific basis for estimating quantity from appearance, end quote. It relied on a DEA chemist for that legal conclusion, yet Officer Meehan did that very thing here. He said I looked at pictures, I eyeballed them, and now I'm going to guess at the quantity. Now, Commander Meehan said that Berkey could have produced at least a pound, right? The waste products found in the pickup, correct? And then Eichert stated that Berkey could have produced 6 to 8 ounces of methamphetamine from the nearly finished mother, and the court, for its sentencing, found that after hearing these estimates, concluded that Berkey was responsible for at least 50 grams or 1.7 ounces. Am I correct factually on that? Yes, but what's incorrect, as a matter of fact, is Officer Meehan's science. He offered no explanation for these conclusory statements. He said he's a trained expert in identifying chemicals. He's not a scientist. He relied on the DEA for this, what I eyeballed to be 6 to 8 pounds of toxic waste to convert that into a pound projection of methamphetamine, but offered no explanation as to how he relied at that conclusion. And I think what the Court was getting at in its comments just now, its question, is saying that the district court was conservative in its ultimate conclusions. However, this Court in Rosacker said at 314 F. 3rd at 426, even conservative estimates must be supported by reliable information. And there certainly was no reliable information here. Well, we have a situation here where your client was sentenced under, what, Category 2. Yes. That range is 63 to 78, and he got a sentence of 70 months. And your contention is it should have been a Category 1. Well, that's with respect to the criminal history calculation that, pursuant to the Supreme Court's recent decision in Alabama, B.D. Shelton, because Mr. Berkey received a criminal history point for a suspended sentence where he didn't have a lawyer. And the Supreme Court said in Shelton that if you have a suspended sentence, that you cannot later be revoked for that suspended sentence and put into prison if you didn't have a lawyer when you received the suspended sentence. We believe that prevents the scoring of the point here. How do you distinguish Nichols, then? I mean, Shelton obviously was a pro per, correct? Yes. In a jury trial where he was convicted, and the court repeatedly warned Shelton about the problems of self-representation but never offered him assistance of counsel at the state expense. And then he gets the sentence. Now, Nichols, how do you distinguish? I mean, in your situation, your client, as my understanding, was offered. There's evidence in the record that he was aware of his right to counsel, and he pled guilty. He chose not to exercise that and pled guilty without the assistance of counsel. They don't – Shelton doesn't seem to be controlling to me. Nichols seems to be controlling. That's what I want you to address. As we explained, particularly in our reply brief, Nichols is distinct because in Nichols the only punishment was a fine. There was no liberty interest at issue, and the judgment didn't result in any loss of liberty. Here, because Mr. Berkey received a suspended sentence, as established in Alabama v. Shelton, there's a liberty interest that necessitated him to have counsel, and that's the distinction. What about the distinction that, you know, Mr. Shelton represented himself pro per and was never offered a lawyer? I mean, isn't that different from your situation? It is in that Mr. Berkey waived counsel. That is a factual difference. I'm going to try to reserve my final few seconds. Thank you. Thank you. Good morning, Your Honors. My name is Josh Vandewetter, and I'm an assistant United States attorney out of the Missoula office of the United States Attorney's Office in Montana. With respect to the drug amount in this case, the court exercised the appropriate caution, as directed by this court, in arriving at a conclusion that Mr. Berkey was responsible for at least 50 grams of methamphetamine. I would note a problem in this case, that is a factual difficulty, is that two labs burned up in this case. There's no question that Mr. Berkey was attempting to manufacture methamphetamine at those labs. He pled guilty to that. It's virtually impossible, or even Commander Meehan would not arrive at an estimate for one of them. What about Mr. I think it's Rhodes? He attacks that, you know, the fundamental qualifications of the expert that testifies. And then the other, well, not the co-defendant, but, you know, someone that was in the same area and could have been a co-defendant. He basically says he's essentially unreliable because he would, you know, so that's where, you know, assuming that the court later comes to a more conservative amount, what about the fact that Mecham or whatever has no qualifications, essentially? I think the mistake in Mr. Rhodes' argument is that he seems to be arguing that Commander Meehan has no qualifications and therefore should not be believed at all. That Mr. Eichert has these problems as a witness to be sure he's potentially a criminal defendant, is involved in criminal activity, and so he should be disbelieved as a witness. And I don't think that's what the law says. It doesn't say you can't believe this person. It doesn't say you can't believe Commander Meehan. You take their information for its value. Commander Meehan's testimony with respect to the amount of drugs certainly is not as valuable as. . . But obviously there's a threshold in terms of, let's say you put a 5-year-old on and to testify, well, I think they had a pound of methamphetamine. Well, you know, obviously there's some sort of threshold that someone would have to establish in terms of their expertise or their personal knowledge of a situation. Sure. Does the commander meet that or that's. . . You know, I understand what you're saying. Experts, they're not all of equal qualifications, and that doesn't mean that they can't testify or it goes more to the weight as to the admissibility. But you still have to meet some sort of threshold, and I'm understanding Mr. Rhodes to say he doesn't even get there. And we would certainly disagree with that, and I would compare for sentencing purposes weight versus admissibility to believability versus reliability. Commander Meehan is certainly believable. His method of determining how much is not as reliable as if we had taken the entire jug, sent it to the lab, weighed out the whole thing, did the test. But Commander Meehan testified that he couldn't do that because of the fact that it's waste material and the lab would not accept it. So it's not as good as it might be, but it certainly passes any threshold. Commander Meehan is an experienced agent. Mr. Berkey admitted that the materials in the back of his pickup truck were the waste products from making methamphetamine. And the same standard goes for Mr. Eichert. He is a competent witness. He gave information to the officers that he had seen this mother on one occasion that it was capable of producing six to eight ounces. On a separate occasion, he saw Mr. Berkey actually. So you say he would maybe have more expertise but less credibility? That would be good. Yeah, I would agree with that. That doesn't mean he's incredible. It doesn't mean that Commander Meehan has no reliability. And I think Mr. Rhodes' argument overlooks the combination of those factors. Certainly, and I would offer this analogy, if you had three Mr. Eicherts or five Mr. Eicherts or ten Mr. Eicherts, by Mr. Rhodes' argument, you could knock out each one of them and say, this guy's unreliable, that guy's unreliable, that guy's unreliable. And individually, they're not as reliable as we'd like them to be. But all put together, it adds up to reliability. Because otherwise, we're left in a case where we're telling the district court, you need to come up with an estimate of the amount of money or, excuse me, the amount of drugs. And here we have a case where there are two fires and some waste, which has not been measured by a laboratory. And there's no way to do it. And we're left scratching our heads saying, gosh, I wonder if Mr. Berkey made any substantive amounts of methamphetamine. And almost, I mean, if you accept Mr. Rhodes' argument, we're going to conclude that, no, it must not have been much, even though everybody involved in the case says that it's a substantial amount. And I would note that Mr. Eichert offers an amount on one occasion that is three to four times more than the district judge ultimately found for the whole series of methamphetamine labs. At this point, Mr. Rhodes doesn't write about Shelton. Well, Mr. Rhodes doesn't write about Shelton for the very reason you suggested, because Nichols controls. Shelton goes out of its way to distinguish Nichols and says flat out, Nichols remains good law. The difference between Shelton and Nichols is that Shelton is facing the possibility of imprisonment on the crime that he took up to the Supreme Court. Here, Mr. Berkey has counsel sitting right here at table. He's had counsel the whole way through. He's facing conviction and jail time on this sentence. Mr. Shelton was also facing jail time on his sentence. That's not the Nichols situation with respect to criminal history and not the Berkey situation with respect to criminal history. Berkey is exactly like Nichols. He got a $130 fine. He did no jail time. He potentially could have received jail time, but I don't think Shelton could not have. Excuse me, Shelton clearly could have received jail time. I don't think Nichols necessarily could not have. That opinion was silent on that issue. So the reason I think Shelton is distinguishable is because it says Nichols is distinguishable. How do we know that he waived counsel on that? I believe that's in the pre-sentence report. It doesn't say anything about waiving counsel. It says he was advised of counsel. It doesn't say anything about waiving counsel. Without looking at the record, then, Your Honor, I can't answer that question. Was he advised of the fact that if he couldn't hire a lawyer, a lawyer would be appointed for him? On the lower misdemeanor? I don't know the answer to that. Isn't that important that we find out? I believe they've conceded that point. Mr. Rhodes has said that he did, in fact, waive counsel, and I can't tell you right now where that is in the record. Do you admit he waived counsel? Your Honor, I thought it said that in the PSR. What? I thought it said that in the PSR. Oh, all right. Anything else? No, Your Honor. Thank you. Your Honors, again, Officer Meehan said he was experienced in identifying chemicals. He didn't say he had experience in calculating drug quantities. Also, the government just referred to Mr. Eichert as a confident witness. He wasn't a witness. He never came to court. He just provided information to law enforcement, who gave it to the probation officer, who put it in the PSR. Moreover, the government's admitting it's in isolation. Its evidence is weak, but saying somehow if you have unreliable or questionable evidence in individual fashion, that you can package it together to result and achieve a reliable result. And you can't. Unreliable information in results in unreliable conclusions, and that's what we have here. Finally, I just encourage the court to read Officer Meehan's testimony. For instance, he repeatedly references the lab reports and relies on them in his testimony. He does so at excerpts of records 10, 12, 18, and 19. Then at excerpts of record 22, he says he didn't read the reports. Moreover, he describes something as a toxic waste that the lab reports call an organic solvent. He does that at excerpts of record 25. And finally, he calls the organic solvent a precursor, an excerpt of record 28. Organic solvents isn't a precursor. Pseudoephedrine is the precursor. It's the chemical that with proper chemistry can be transformed into methamphetamine. You can't transform an organic solvent into methamphetamine, yet Officer Meehan throws about loosely and wrongly the term precursor, and that just again shows how unreliable he is. So we believe because the district court based its drug quantity determination on unreliable evidence, this court should reverse so that we can go back and present proper evidence to the district court. And second, with respect to the Alabama v. Shelton issue, we believe because Mr. Berkey received a criminal history point for a suspended sentence where he did not have counsel that the district court improperly included that conviction in scoring Mr. Berkey's criminal history category. You're correct. In the PSR number 35, that's where it says he was advised by counsel. He was advised of his right to counsel. Yeah. It went to MCA 46-8-101. Thank you, Your Honors. The matter will stand submitted. We'll call the next item.
judges: Pregerson, Ferguson, Callahan